UNITED STATES of America, Plaintiff-Appellee,

v.

Ronald Dale DUNN, Defendant-Appellant.

No. 81–1200.

United States Court of Appeals, Fifth Circuit.

July 16, 1985.

Rehearing and Rehearing En Banc Denied Sept. 11, 1985.

Louis Dugas, Jr., Orange, Tex., for Dunn.

Edward Charles Prado, Interim U.S. Atty., Ms. Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., Ann T. Wallace, Atty., Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

## ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before WISDOM, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

Granting the government's petition for writ of certiorari, *United States v. Ronald Dale Dunn,* 466 U.S. ——, 104 S.Ct. 2380, 81 L.Ed.2d 340 (1984), the Supreme Court vacated our disposition of Dunn's appeal, *United States v. Dunn,* 674 F.2d 1093 (5th Cir.1982), and remanded "for further consideration in light of *Oliver v. United States,* 466 U.S. [170] [104 S.Ct. 1735, 80 L.Ed.2d 214] (1984)." Consistent therewith we have reconsidered our decision in light of the teachings of *Oliver* on the question of open fields and curtilage in fourth amendment analytical methodology. Upon reconsideration, we conclude that the barn in which Drug Enforcement Agent Ronald Gospodarek found the phenylacetone laboratory was not within the constitutionally protected curtilage of the ranch house. We have further concluded, however, that the agent's actions in crossing two fences alongside and around the barn, going under the front overhang of the barn to a position immediately adjacent to an inset wall and, with aid of a flashlight, peering through the barn's front fishnet covering to view its contents on November 5, 1980, violated the fourth amendment and tainted the subsequent seizures and inculpatory statements. Accordingly, we reverse the convictions of Dunn and remand for further proceedings. In doing so we reinstate a portion of the panel opinion as detailed herein.

### Background Facts [1]

In the summer of 1980, Robert Lyle Carpenter, charged and convicted as a codefendant with Dunn, began accumulating large quantities of chemicals and equipment typically used for the manufacture, *inter alia,* of phenylacetone, a controlled substance. DEA agents who had Carpenter under surveillance obtained warrants for the installation of electronic beepers in purchases made by Carpenter, specifically an electric hot plate stirrer, a drum of acetic anhydride, and a container of phenylacetic acid. Guided by the beepers, DEA agents trailed Carpenter from Houston to Dunn's ranch near Johnson City, Texas during the morning of November 5, 1980. That afternoon, agent Gospodarek examined the ranch by air and took several aerial photographs.

The Dunn ranch contained 198 acres and was circled by a perimeter fence. The ranch house, outbuildings and improvements were one-half mile from a public road, connected by a private driveway blocked by a locked chain. The residence and other buildings were clustered in a small clearing not visible from either the public road or the perimeter fence. In addition to the exterior fence, there were several interior fences, most composed of multiple strands of barb wire.

The ranch house enclave contained the ranch house, a large garage/carport, a small greenhouse, two barns, a windmill and a stone water tank. There were several fences, including one around the ranch house and greenhouse, another around a side yard, one running from the ranch house to the large barn, and one traversing the front of the large barn. The large barn

---

1. For additional factual data we refer to our earlier opinion, 674 F.2d 1093.

was approximately 50 yards behind the fence encircling the ranch house and the small barn was about thirty yards to its side separated by the windmill and the water tank.

The back and sides of the large barn were composed of brick, metal siding, and large metal sliding doors and were completely enclosed. The front of the barn was partially composed of a wooden wall with windows. The remainder was enclosed by waist-high wood slatting and wooden gates. At the time of agent Gospodarek's visits on the night of November 5 and again the next day, the top half of the front of the barn was covered by a fishnet type material from the ceiling down to the top of the locked wooden gates. To see inside the barn it was necessary to stand immediately next to the netting. From as little as a few feet distant, visibility into the barn was obscured by the netting and slatting.

Around 9:00 p.m. on November 5, 1980, Gospodarek and officer Martin Fite of the Houston Police Department made surreptitious entry into the Dunn ranch. They crossed the perimeter fence and one other before reaching the clearing midway between the ranch house and barns. At that point Gospodarek smelled what he believed to be stored phenylacetic acid in solid state. The officers crossed one barb wire fence and looked into the smaller barn but saw only empty boxes. They crossed another barb wire fence, reached the closed side of the larger barn, walked around the back and sides but could not see inside. They retraced their steps and scaled a wooden fence at the front of the barn, entered under the overhang of the barn and walked to the locked front wooden gates topped by the netting material. After checking the house and determining that a flashlight could be used without the likelihood of discovery, Gospodarek shined his light through the openings in the netting, peered through and saw chemicals and equipment positioned in what appeared to be a manner typical of a crude phenylacetone laboratory. Gospodarek described the setting of the lab as being in a "closed-in area with

walls on all sides except for the front where the waist-high gate and the fishnet was."

Principally based on agent Gospodarek's observations on the night of November 5, the DEA obtained a search warrant on November 6. The warrant was executed on the morning of November 8 at which time Dunn was arrested and the chemicals, equipment, and a quantity of amphetamines were seized. In response to questions after his arrest Dunn admitted his culpability and directed the officers to a closet containing bags of the finished illicit product.

In our earlier opinion we concluded that the place from which agent Gospodarek viewed the contents of the barn was within the curtilage of the ranch house and thus was protected by the fourth amendment. Since the search was without a warrant we found it illegal, tainting the physical evidence found in the barn and house as well as the inculpatory statements made by Dunn after his arrest. We directed the suppression of all such evidence. It is this holding we have re-examined in light of the *Oliver* decision.

## Analysis

In *Oliver* the Supreme Court reaffirmed its benchmark holding authored by Justice Holmes in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), declaring that the fourth amendment extends to the home and its curtilage but does not extend to open fields. The Court defined curtilage as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" 466 U.S. at ——, 104 S.Ct. at 1742, 80 L.Ed.2d at 225. In a footnote Justice Powell, writing for the majority added that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." 466 U.S. at ——, 104

S.Ct. at 1743, 80 L.Ed.2d at 226 n. 12. Having given this direction, the Court declined to speak with specificity about the extent or precise parameters of the curtilage and found it unnecessary "to consider the scope of the curtilage exception to the open fields doctrine or the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself." 466 U.S. at ——, 104 S.Ct. at 1742, 80 L.Ed.2d at 225 n. 11. Referring with apparent approval to a decision by this circuit (*United States v. Williams*, 581 F.2d 451 (5th Cir.1978)), and those of two of our sister circuits, the Court concluded its guidance on the definitional process by noting that the courts of appeals considering the issue "have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." 466 U.S. at ——, 104 S.Ct. at 1742, 80 L.Ed.2d at 225.

■ The lessons of *Oliver* are clear as applied to a part of the instant inquiry. It is apparent that agent Gospodarek and officer Fite did not violate the fourth amendment by crossing the perimeter fence and any cross fences as they approached the ranch house enclave. It is also apparent that their continued progress toward the large barn was not proscribed by the Constitution so long as they remained in open fields, outside the curtilage. The effect of their circling the large barn, being unable to see inside through the back or sides, climbing a wooden fence at its front, entering its overhang and going into the immediate proximity of the fishnet and wooden gate front enclosure, is not so informed by *Oliver's* lead and nudge.

■ In this circuit's prior jurisprudence, essentially collected in *United States v. Williams* cited by the Supreme Court, as well as in decisions by our colleagues in other circuits, three factors seem to surface in the curtilage-quest: (1) the distance between the place in question and the house; (2) whether the place is within a general enclosure that includes the house;

and (3) the purpose or use of the questioned place. *See Care v. United States*, 231 F.2d 22 (10th Cir.1956).

The barn in the case *sub judice* was located approximately 50 yards beyond the fence which encircled the ranch house. In *Walker v. United States*, 225 F.2d 447 (5th Cir.1955), we held that the curtilage there included a barn 70 to 80 yards distant from the principal dwelling. Although relevant, distance alone is not dispositive of the question.

The second factor, commonality of enclosure, militates against Dunn's contention that the barn was in the curtilage. The ranch house and large barn were not within a common enclosure, they were separately enclosed. A substantial fence surrounded the ranch house, garage/carport and greenhouse, making those buildings an apparent unit. A lesser fence enclosed the front of the large barn, connecting to its sides. The open area between the ranch house and barn was partially fenced.

The third factor, purpose or use, weighs on the curtilage tray. A barn is a typical part of a farm or ranch and has been referred to as "a domestic building constituting an integral part of that group of structures making up the farm home." *Walker v. United States*, 225 F.2d at 449. *See also United States v. Williams; United States v. Tabor*, 722 F.2d 596 (10th Cir.1983).

■ Weighing these factors under the illumination of *Oliver*, giving particular weight to the presence of the two separate fences plus a fenced-in open space between the large barn and the ranch house, we are persuaded, albeit not without substantial reservation, that the large barn was not within the protected curtilage of the Dunn ranch house. This conclusion does not end our inquiry, however, because the fourth amendment applies to places other than just houses and their curtilages.

The holding of *Oliver* relates only to open fields. The Court declares "from the text of the Fourth Amendment and from the historical and contemporary under-

standing of its purposes, that an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." 466 U.S. at ——, 104 S.Ct. at 1742, 80 L.Ed.2d 225–26. We must decide whether agent Gospodarek and officer Fite went beyond the permissible open fields and intruded into a constitutionally protected area when they approached and peered into the large barn.

In discussing the reach of open fields the *Oliver* Court observed:

It is clear, however, that the term "open fields" may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither "open" nor a "field" as those terms are used in common speech. For example, a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment.

466 U.S. at ——, 104 S.Ct. at 1742, 80 L.Ed.2d at 225 n. 11. The term has been applied to land which is fenced or posted and to vacant lots in urban areas, open beaches, reservoirs, and open waters. *See* LaFave, *Search & Seizure* (1978) § 2.4 nn. 5–13. We have found no case, however, applying the term to a building of any consequence.

■ Fourth amendment protection has been extended to commercial buildings, warehouses, containers, modes of transportation, even telephone booths, in short, nearly any structure or item in which a person has a reasonable expectation of privacy. *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (stone quarry); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1979) (furniture store); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (electrical and plumbing installation facilities); *See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (warehouses); *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (leasing offices); *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) (union offices);

*Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel rooms); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (telephone booth); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (footlocker); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (luggage); *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1974) (vehicle); *United States v. Ehrlichman*, 546 F.2d 910 (D.C.Cir.1976) (psychiatrist office); *Piazzola v. Watkins*, 442 F.2d 284 (5th Cir.1971) (college dormitory room); *United States v. Duckett*, 583 F.2d 1309 (5th Cir.1978) (mail); *United States v. Nasser*, 476 F.2d 1111 (7th Cir.1973) (government office); *United States v. Speights*, 557 F.2d 362 (3rd Cir.1977) (lockers); *United States v. Trickey*, 711 F.2d 56 (6th Cir. 1983) (outbuilding of printing business); *United States v. Emens*, 649 F.2d 653 (9th Cir.1980) (boats). A barn is as much a part of a rancher's place of business as a warehouse or outbuilding is part of an urban merchant's place of business. It is and ought to be constitutionally protected from warrantless searches if the owner or occupier takes reasonable steps to effect privacy. For as the Court noted in *Katz v. United States*, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582 "the Fourth Amendment protects people not places."

■ Dunn took a number of steps to preserve privacy. Some result from the layout of his ranch and others from his affirmative acts. These steps, with different applications and different weights, all factor into the final conclusion. The barn was located in a clearing surrounded by woods on a 198 acre tract. The ranch was circled by a perimeter fence. The ranch house and buildings were at the end of a private drive approximately one-half mile from a public road. The entrance to the private driveway was secured by a locked chain. The barn was not visible from the public road or perimeter fence. The contents of the barn could not be seen from aerial observation, nor were the contents visible from the ground unless one ap-

proached the barn, penetrated its encircling fence, walked under its overhang and stood next to its fishnet front covering. Even then, entry could be made only by force or the hurdling of wooden gates which were locked.

Considering the location, type and placement of the structure, and the other steps Dunn took to limit access to the barn, we find that Dunn had a reasonable expectation of privacy in his barn and its contents. Accordingly, the fourth amendment abrogates the warrantless intrusion by agent Gospodarek and officer Fite on the night of November 5, 1980. That search required a search warrant.

In our original opinion vacated by the Supreme Court we reached the conclusion that the viewing of the barn and its contents by Gospodarek and Fite was violative of the fourth amendment because the barn was within the protected ambit of the curtilage. We have again reached the conclusion that the barn was subject to constitutional protection, separate and apart from any consideration of the curtilage conundrum. We must now address the remaining issues raised by this appeal which were resolved in the original opinion.

▬▬ Convinced beyond peradventure that *Oliver* has no impact on those parts of our opinion subtitled "Probable Cause and Exigent Circumstances" and "Dunn's Statements," 674 F.2d 1100–03, we reinstate those paragraphs, the same as if set forth here in extenso and verbatim. We repeat only the final paragraph.

The convictions of Ronald Dale Dunn are REVERSED and the matter is REMANDED for further proceedings not inconsistent herewith.