**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Frank Daniel GLICK, II, Defendant–Appellee.**

No. 10SA367.

Supreme Court of Colorado, En Banc.

April 25, 2011.

Bill Thiebaut, District Attorney, Tenth Judicial District, Anthony Marzavas, Chief Deputy District Attorney Pueblo, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Kim Karn, Deputy Public Defender Pueblo, Colorado, Attorneys for Defendant–Appellee.

Chief Justice BENDER delivered the Opinion of the Court.

## I. Introduction

The prosecution brings this interlocutory appeal pursuant to section 16–12–102(2), C.R.S. (2010) and C.A.R. 4.1 seeking to reverse the trial court's ruling suppressing evidence, observations, and statements obtained from the search of the defendant, Frank Daniel Glick's, home. The trial court ordered the suppression of the evidence because it concluded that the police officers who arrested Glick conducted an unreasonable warrantless search of Glick's home when they shined their flashlights into his home from their position on the home's front doorstep. We reverse.

We decide that an officer positioned at a lawful vantage point may use a flashlight to make plain view observations that during daylight would not constitute a search. The officers in this case were lawfully positioned on the defendant's front doorstep for the purpose of investigating a crime when the defendant left his front door ajar. Hence, the use of flashlights by the officers to make plain view observations inside of the defendant's home was permissible. Having lawfully viewed the evidence in the defendant's home, the officers then properly seized that evidence pursuant to the plain view doctrine.

Consequently, we hold that the trial court erred in granting Glick's motion to suppress evidence, statements, and observations, and we remand the case to the trial court for proceedings consistent with this opinion.

## II. Facts and Procedural History

The prosecution charged Glick with possession of a controlled substance. Glick sought to suppress all evidence, observations, and statements obtained by police from the search of his home. At the initial suppression hearing, Officers Maldonado and Ordway of the Pueblo Police Department testified to the following facts.

At 6:15 a.m. on October 25, 2009, the Pueblo Police Department received a "hang-up" 911 call from an unidentified woman who requested assistance at 2143 E. 13th Street in Pueblo. Pueblo Police Officers Maldonado, Ordway, and Oliva responded to the call. When the officers arrived at East 13th Street, they discovered that there was no such address. Attempting to locate the source of the 911 call, the officers began contacting other addresses on the street end-

ing in the number 3. Glick's home, 2113 E. 13th Street, was the second address the officers checked.

Officer Maldonado rang the doorbell, and Glick opened the front door. Glick appeared as if he had just woken up. Officer Maldonado told Glick that they were investigating a hang-up 911 call and asked if there were any other people in the house. Glick responded that his girlfriend and his roommate were also in the house. Officer Maldonado then asked if the officers could come inside and if he could speak with the other occupants to make sure they were safe. Glick said that the officers could speak with the other occupants, but he asked the officers to stay outside.

When Glick went to get his girlfriend, he left the front door "wide open." There were no lights on inside the home. Standing in front of the open door, without crossing the threshold of the door, Officers Maldonado and Ordway looked inside the home and saw on a small table "some drug paraphernalia ... and some green leafy substance and a green plate which had [ ] a white rock like substance with a razor on it." They suspected both substances were narcotics.

When Glick returned with his girlfriend, Officer Maldonado saw Glick walking toward the table with the suspected narcotics. Presuming that Glick was approaching the table to try to destroy the narcotics, Officer Maldonado entered the house. Glick then picked up the rock of suspected cocaine, and Officer Maldonado told Glick to drop it. In response, Glick put the rock back on the plate, and Officer Maldonado arrested him.

At the hearing, the prosecution and defendant disputed whether the officers used their flashlights while standing on Glick's doorstep to see inside his home. Officer Maldonado testified that, although the rising sun provided sufficient natural light to see inside the home, he "believed" he had his flashlight out and used it to see inside the house "in reference to attempting to find a disturbance of any kind in that house." Officer Ordway testified that he could not remember the lighting conditions and that, although he

could not remember, he was probably using his flashlight.

The defendant also introduced into evidence photographs taken by an investigator with the State Public Defender's Office. The investigator took the photographs between 6:15 and 6:50 a.m. on October 25, 2010, precisely a year after the defendant was arrested. The photographs show that, although the sun was beginning to rise at the time the officers contacted Glick, from the perspective of the officers standing on Glick's doorstep, Glick's home would have been dark, and they would not have been able to see inside Glick's home without using their flashlights.

From this evidence, the trial court found that "it was still dark and [the officers] could not see any detail inside the home" and that the officers "shined their flashlights into the living room of the home" where they saw suspected drugs and drug paraphernalia. The trial court concluded that, standing on the front porch of Glick's home, the officers "were located in a position where they had a right to be, based on the circumstances of the contact to check on the welfare of any female occupants of the home." However, the trial court granted Glick's motion to suppress because it concluded that "the officers conducted an unreasonable warrantless search of [d]efendant's home when they shined their flashlights into the darkened room, and that the suspected contraband was not in plain sight in the absence of the unreasonable search."

To reach this conclusion, the trial court distinguished the circumstances of this case from cases where we held that, when an officer shines a flashlight into an automobile in a public place, anything seen in the passenger compartment is considered to be in plain view. The trial court reasoned that the expectation of privacy in a home is higher than that in a car and, therefore, the use of a flashlight to see inside a darkened home constitutes an unreasonable search, even where the officers do so from a location where they have a right to be.

The prosecution then filed this interlocutory appeal.[1]

1. The prosecution presented two issues for our review:

### III. Standard of Review

Appellate review of a trial court's suppression order is a mixed question of law and fact. *People v. Pitts*, 13 P.3d 1218, 1221–22 (Colo.2000). The trial court's legal conclusions are subject to de novo review. *People v. Gothard*, 185 P.3d 180, 183 (Colo.2008). However, we defer to a trial court's findings of fact if those findings are supported by competent evidence in the record. *Pitts*, 13 P.3d at 1221. We will not substitute our own judgment for that of the trial court unless the trial court's findings are clearly erroneous or not supported by the record. *Id.*

### IV. Summary

On appeal, the prosecution challenges the trial court's order granting Glick's motion to suppress. The prosecution argues that the trial court erred in two ways: first, by finding facts contrary to the record evidence, and second, by finding as a matter of law that the officers conducted an illegal search when they shined their flashlights into Glick's home. We address each argument in turn. With respect to the first issue, we find that the trial court's finding that the officers used their flashlights to see inside Glick's home is not clearly erroneous. Then, we conclude the officers did not conduct an illegal search when they used their flashlights to observe evidence inside Glick's home and that the plain view doctrine justified the officers' seizure of that evidence.

Consequently, we hold that the trial court's grant of Glick's motion to suppress was erroneous.

### V. Analysis

#### A.

We begin by considering whether the trial court erred when it found that Officers Maldonado and Ordway used their flashlights to see inside Glick's home.

In this case, although there was conflicting testimony, the trial court's conclusion that

Officers Maldonado and Ordway used their flashlights to see inside of Glick's home is not clearly erroneous. At the suppression hearing, Officer Maldonado testified that there were no lights on inside the home but that the sun was coming up and there was sufficient light to see inside the house. However, in response to questioning as to whether he used his flashlight, Officer Maldonado responded, "Yes. Sometimes we do that, yeah. At the time, I would believe so. I always do." He also stated that he used his flashlight "in reference to attempting to find a disturbance of any kind in that house." Officer Ordway testified that he could not remember the lighting conditions but, "I'm sure I was using my flashlight as I normally do." Furthermore, an investigator for the defense presented evidence that, at the same time on the same date of the following year, it was too dark to see inside of Glick's home without using a flashlight.

Under these circumstances, we conclude that the trial court's finding that the officers used their flashlights to see inside of Glick's home is not clearly erroneous.

#### B.

Having concluded that the trial court's finding that the officers used their flashlights to see inside Glick's home is not clearly erroneous, we turn to considering whether this police action constitutes an illegal search.

On appeal, the prosecution asserts that Officers Maldonado and Ordway observed the contraband from a lawful vantage point and in plain view and that the officers' use of their flashlights does not transform this lawful observation into an illegal search. Supporting the trial court's conclusion, Glick contends that, because the officers could not have seen the contraband but for the use of their flashlights, the plain view doctrine does not apply to this case and Officers Maldonado and Ordway conducted an illegal search

---

(1) Did the trial court make adequate findings regarding the testimony presented at the motions hearing in order for the court to conduct a meaningful review?

(2) Did the trial court err in finding that the shining of a flashlight into an area where police officers had a legal right to be constitute an unreasonable search and seizure?

when they shined their flashlights through the open doorway into his home.

The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution proscribe all unreasonable searches and seizures. For purposes of the Fourth Amendment's warrant requirement, "[a] search occurs when the government intrudes on an area where a person has a 'constitutionally protected reasonable expectation of privacy.'" *Henderson v. People,* 879 P.2d 383, 387 (Colo.1994) (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). If an inspection by police does not intrude upon a legitimate expectation of privacy, there is no "search" subject to the Fourth Amendment. *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). When evidence is already in plain view, its observation by police "would not involve any invasion of privacy." *Horton v. California,* 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Under this reasoning, the mere observation of evidence in plain view does not constitute a search for purposes of the Fourth Amendment provided that the officer is lawfully present at the vantage point where he makes the observation. *See Hoffman v. People,* 780 P.2d 471, 473–74 (Colo.1989) (stating that "the mere observation by government officials of that which is plainly visible to anyone does not constitute a search" and holding that officers' observations lawfully made from outside the curtilage of a home did not violate the Fourth Amendment); 1 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 2.2 (4th ed. 2004) ("As a general proposition, it is fair to say that when a law enforcement officer is able to detect something by utilization of one or more of his senses while lawfully present at the vantage point where those senses are used, that detection does not constitute a 'search' within the meaning of the Fourth Amendment.").

For instance, in *United States v. Dunn,* officers investigating a suspected amphetamine and phenylacetone laboratory made a warrantless entry onto the defendant's ranch property and, after crossing several fences surrounding the barn, looked over the barn's locked wooden gates and observed evidence of the laboratory. 480 U.S. 294, 297–98, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Holding that the officers' observations were constitutional, the United States Supreme Court reasoned that the officers had not violated the Constitution in reaching their vantage point at the gates of the barn and, therefore, that, once at that proper vantage point, "the Constitution did not forbid them to observe the phenylacetone laboratory located in [the defendant's] barn." *Id.* at 304, 107 S.Ct. 1134.

Likewise, in previous cases, we have held that it is not a search within the meaning of the Fourth Amendment for an officer standing in a public place to view the interior of a private residence by looking through an uncovered window. *See People v. Gomez,* 632 P.2d 586, 592 (Colo.1981) (officer looked through window into the defendant's motel room); *People v. Donald,* 637 P.2d 392, 394 (Colo.1981) (officer looked through living room window of the defendant's apartment). In *Gomez,* we reasoned that "[a] sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter.... The officer who walks upon such property so used by the public does not wear a blindfold; the property owner or occupant must reasonably expect him to observe all that is visible." 632 P.2d at 591. By this reasoning, we concluded that "[u]nder such circumstances the defendant cannot claim a reasonable expectation of privacy" and, therefore, the observations made by the police from that lawful vantage point do not constitute a search and do not violate the Fourth Amendment. *Id.*

Just as police do not violate a defendant's privacy rights when they enter onto residential areas that are open to the public, we have held that "[t]here can be no reasonable expectation of privacy in a residential area that is expressly or impliedly held open to casual visitors." *People v. Terrazas–Urquidi,* 172 P.3d 453, 456 (Colo.2007). Moreover, because an officer may enter residential areas that are expressly or impliedly held open to casual visitors, police do not infringe

on an occupant's privacy rights by entering a defendant's property and knocking on the door of his residence for the purpose of investigating a crime. *Id.; People v. Baker*, 813 P.2d 331, 333 (Colo.1991). Consequently, an officer lawfully positioned outside the front door of a residence may observe evidence that is plainly visible from this lawful vantage point without violating the defendant's privacy rights or conducting a search for purposes of the Fourth Amendment. *See Terrazas–Urquidi*, 172 P.3d at 456–57; *Baker*, 813 P.2d at 333.

Because the mere observation of evidence in plain view does not constitute a search under the Fourth Amendment provided the officer is lawfully present at the vantage point where he makes the observation, we must next consider whether an officer's use of a flashlight transforms his observations into a search.

We have previously considered this issue in cases concerning the use of a flashlight by a lawfully positioned officer to look into the passenger compartment of a vehicle. Under those circumstances, we have held that because "[t]here is no legitimate expectation of privacy shielding [the passenger compartment] of an automobile" from the public, "[t]he fact that a police officer uses a flashlight to look into the car does not cause her viewing to become a search." *People v. Romero*, 767 P.2d 1225, 1227 (Colo.1989); *accord People v. Dickinson*, 928 P.2d 1309, 1313 (Colo.1996).

Although we have not previously considered the use of a flashlight to view inside residential premises, most courts addressing this issue have reasoned that, so long as the officer makes the observation from a lawful vantage point, the officer, during hours of darkness, may use a flashlight to make plain view observations that during daylight would not constitute a search. In *United States v. Dunn*, the Supreme Court upheld the investigating police officers' use of their flashlights during the evening hours to see into a darkened barn. 480 U.S. at 305, 107 S.Ct. 1134. It reasoned that, because the officers looked into the "essentially open front" of the defendant's barn from a lawful vantage point, "the officers' use of the beam of a flashlight . . .

did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment." *Id.*

Similarly, in *State v. Rose*, the Washington Supreme Court considered whether an investigating officer conducted an illegal search when, from a lawful position on the defendant's front porch, "he shined his flashlight through a window [of the defendant's mobile home] and saw cut marijuana and a scale on a table inside." 128 Wash.2d 388, 909 P.2d 280, 282 (1996). Concluding that the officer's observations did not violate the Fourth Amendment, the court reasoned:

[T]he fact that a flashlight is used does not transform an observation which would fall within the open view doctrine during daylight into an impermissible search simply because darkness falls. One who leaves contraband in plain sight, visible through an unobstructed window to anyone standing on the front porch of his residence, does not have a reasonable expectation of privacy in the visible area.

*Id.* at 286; *accord State v. Johnson*, 171 N.J. 192, 793 A.2d 619, 630 (2002) (upholding observations made by a police officer who, lawfully on the defendant's front porch to investigate a report of drug activity, used his flashlight to observe contraband in plain view); *Commonwealth v. Pietrass*, 392 Mass. 892, 467 N.E.2d 1368, 1373 (1984) (reasoning that an officer's use of a flashlight to look through a home's window from its enclosed front porch was not a search if the officer was lawfully on the porch); *State v. Crea*, 305 Minn. 342, 233 N.W.2d 736, 739–40 (1975) (holding that police who were lawfully on the premises investigating a theft acted reasonably when they used their flashlights to look through an uncovered basement window); *State v. Humphrey*, 138 P.3d 590, 596 (Utah Ct.App.2006) (upholding plain view observations made by officers who used their flashlights to illuminate the interior of the defendant's mobile home after the officers were allowed inside by the defendant and stating that "the use of a flashlight to assist the natural vision at night does not make an 'observation' a 'search' ").

Reviewing this authority, we agree that an officer, who is positioned at a lawful vantage

point, may use a flashlight to make plain view observations that during daylight would not constitute a search under the Fourth Amendment. When an officer's plain view observation of evidence during daylight would not constitute a search for purposes of the Fourth Amendment, the fact that the officer uses a flashlight because darkness has fallen does not transform the officer's observations into an unreasonable search.[2]

In this case, Officers Maldonado and Ordway approached Glick's home and knocked on his door for the purpose of investigating a 911 call from a female needing assistance. Having contacted Glick for this purpose, the officers were lawfully on Glick's front doorstep. From that lawful vantage point, the officers could observe evidence that was plainly visible through Glick's "wide open" doorway. The fact that the officers used their flashlights to see inside Glick's home did not transform their plain view observations into a search because, had it been daylight, the contraband on the table inside the home would have been plainly visible to the officers.

Under these circumstances, we hold the officers did not violate Glick's Fourth Amendment rights when they used their flashlights to make observations through Glick's open front door.

### C.

■ Having decided that the observations made by Officers Maldonado and Ordway did not constitute an illegal search, we next consider whether Officer Maldonado's seizure of the evidence in Glick's home was proper.

■ While police officers do not conduct a search for purposes of the Fourth Amendment when they merely observe evidence in plain view from a position where they have a right to be, police must have additional justification to enter the home and seize that evidence without a search warrant. The Fourth Amendment requires police to have an additional justification to seize the evidence because, although the owner of an item in plain view has no reasonable expectation of privacy in that item, the owner still "retain[s] the incidents of title and possession." *Andreas,* 463 U.S. at 771, 103 S.Ct. 3319.

■ The plain view doctrine provides a basis for seizing evidence in plain view so long as the seizure satisfies three requirements: (1) the initial intrusion onto the premises was legitimate; (2) the police had a reasonable belief that the evidence seized was incriminating; and (3) the police had a lawful right of access to the object seized. *Gothard,* 185 P.3d at 183. Under the plain view doctrine, as long as the incriminating character of an item is immediately apparent and the officer seizing it is lawfully located in a place from which he can both plainly see and lawfully access it, a warrantless seizure does not offend the Fourth Amendment. *People v. Koehn,* 178 P.3d 536, 537 (Colo. 2008).

As to the first requirement, that the initial intrusion onto the premises was legitimate, we have held that, for the purpose of investigating a crime, an officer may enter residential areas that are expressly or impliedly held open to casual visitors and may knock on the door of a residence. *Terrazas–Urquidi,* 172 P.3d at 456; *People v. Shorty,* 731 P.2d 679, 682 (Colo.1987).

The second requirement is established if the incriminating nature of the evidence was immediately apparent to the officer. *People v. Alameno,* 193 P.3d 830, 834 (Colo.2008). In other words, this requirement is satisfied where the officer had probable cause to associate the item with criminal activity without conducting a further search. *Id.*

As to the third requirement, that the police had a lawful right of access to the object seized, we have held that police may enter a

---

**2.** We do not address whether it would constitute a search for an officer to use a flashlight in a situation in which a person, "in effect, 'creates' darkness within premises by the manner in which he closes and secures the building." La-Fave, *Search & Seizure* § 2.2; *see also State v. Tarantino,* 322 N.C. 386, 368 S.E.2d 588, 590 (1988) (holding that a police officer conducted an unreasonable search where the officer searched a heavily boarded-up building "until he found cracks in the wall" and "[b]y maneuvering his body and shining his flashlight through the cracks ... illuminated a small part of the building's interior").

home and seize evidence without a warrant if the prosecution can prove that a sufficient exigency existed, such as where there is a risk of immediate destruction of evidence. *People v. Crawford*, 891 P.2d 255, 258 (Colo. 1995). Under this exception, "the police must have a reasonable suspicion that relevant evidence is in imminent danger of being destroyed," and "the possibility of obtaining a warrant [is] not viable because of the ability and likelihood that the defendant would destroy or remove important evidence before the warrant could issue." *Id.*

In this case, we find that the prosecution satisfied each requirement of the plain view doctrine. First, the police were lawfully on the premises for a legitimate investigative purpose—to investigate the 911 call and check on the welfare of any female occupants of the home. Second, from their legitimate vantage point, the officers observed the contraband on the table including drug paraphernalia and suspected narcotics—a leafy green substance and a white rock-like substance. Thus, the incriminating nature of the evidence was immediately apparent to the officers. Third, the officers had a lawful right to access the evidence to avoid the immediate destruction of the evidence. Officer Maldonado saw Glick walk toward the table with the suspected narcotics. Assuming Glick was attempting to destroy the evidence, Officer Maldonado entered the home. By this time, Glick had picked up the rock of suspected cocaine, and Officer Maldonado told Glick to put it down and then arrested him.

Accordingly, we find that the plain view doctrine justified the officers' seizure of evidence in Glick's home.

## VI. Conclusion

For the reasons stated above, we hold that the trial court erred in granting Glick's motion to suppress evidence, statements, and observations, and we remand the case to the trial court for proceedings consistent with this opinion.