No. 2--06--0376          Filed 3-15-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05--CF--3708 |
| CHARLES A. MIKRUT, | ) ) ) | Honorable Theodore S. Potkonjak, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

The State appeals the judgment of the trial court suppressing evidence obtained against the defendant, Charles A. Mikrut. At issue is whether the seizure of firearms inside a bedroom in Mikrut's home violated the fourth amendment when, over Mikrut's objections, a woman who had previously stayed there admitted officers to the home to assist her in obtaining her belongings. Applying a recent United States Supreme Court case, Georgia v. Randolph, 547 U.S. ___, 164 L. Ed. 2d 208, 126 S. Ct. 1515 (2006), the trial court suppressed the evidence. The State appeals, arguing that Mikrut did not specifically refuse consent and that the police were acting in a community caretaking function and seized items in plain view. We determine that, having found that Mikrut refused consent, the trial court properly applied Randolph. Further, because Mikrut was secured in his living room, the officers acted beyond the scope of any community caretaking function when they entered Mikrut's bedroom. Accordingly, we affirm.

## I. BACKGROUND

On March 10, 2005, Burlyn Phillips, a woman who had been staying in Mikrut's home, met with Officer Michael Ostertag of the Fox Lake police department for assistance in retrieving her personal belongings from Mikrut's home. Phillips referred to Mikrut as her "boyfriend" and stated that she was afraid of him. She told Ostertag that she had an argument with Mikrut, that he was quite irate, and that he had made threats of violence.

Ostertag asked Phillips whether Mikrut had ever been violent toward her or police officers and whether Mikrut possessed any firearms. Phillips replied that she never witnessed anything, but Mikrut told her that he once kidnapped a police officer during a narcotics incident and that he served 14 years in prison for that offense. She also stated that Mikrut had a rifle and a pistol. Ostertag asked his dispatcher to check if Mikrut had a firearms owner's identification card (FOID card), and the dispatcher reported that he did not.

Ostertag and two other officers, Officer Kenneth Welsch and Officer Monson, accompanied Phillips to Mikrut's home. The officers approached the door, and according to Ostertag, Mikrut opened it and protested the police presence. Ostertag testified that Mikrut did not want the police in his residence. Welsch testified that Mikrut became irate and continuously questioned why the police were at his home. Welsch also stated, however, that he believed Phillips opened the door and that Mikrut did not ask the officers to leave. According to Welsch, when the officers explained that they were there to assist Phillips in retrieving her belongings, Mikrut was still upset, but backed up and entered his living room.

While Mikrut was in his living room, Welsch accompanied Phillips to the bedroom to collect her belongings, which generally consisted of clothing. Phillips opened the closet and Welsch saw

a rifle in it. Welsch removed the rifle from the closet to be sure that it was a "safe weapon." He then informed Ostertag that there was a rifle in the bedroom.

While Welsch was with Phillips, Ostertag and Monson remained with Mikrut in the living room. They asked Mikrut if he had any firearms, and he replied that he did not. When Welsch informed them that there was a rifle in the bedroom, Mikrut admitted that he had weapons. He informed the officers that there was also a pistol in the bedroom and that he was unable to produce a FOID card. The officers asked Mikrut to accompany them to the bedroom and indicate where the pistol was located so that they could retrieve it. Mikrut did so and the officers arrested him. According to Ostertag, Mikrut never had immediate access to the firearms and Ostertag never feared for his own safety. The officers stated that they did not go to Mikrut's home with the intent to look for weapons and that their only purpose was to assist Phillips.

According to Mikrut, Phillips did not permanently stay in his home. Instead he defined her stay as "more transient than permanent," stating that she would stay for a couple of days and then be gone for four or five days. He said that Phillips had moved out about 10 days before the police arrived with her to recover her clothing. According to Mikrut, he told the police that they could not come in and the officers forced their way into the home by walking into him until they were able to enter. He ended up in the living room, where the officers told him to sit on the couch and calm down, so that is what he did.

Mikrut moved to suppress the evidence, arguing that the officers did not have reasonable grounds to enter his home or to seize the weapons. The trial court denied the motion and Mikrut moved for reconsideration. On reconsideration, the court granted the motion in light of the decision in Randolph. Factually, the court found that the officers reasonably believed that Phillips had

authority to give them permission to enter Mikrut's home. But the court also found that Mikrut refused permission. The court then found that because Mikrut was secured in the living room, there was no real need for the officers to accompany Phillips to the bedroom. Based on those findings, the court suppressed the evidence under Randolph. The State appeals.

## II. ANALYSIS

### A. Mikrut's Objections to the Police Presence in His Home

As a threshold matter, the State argues that Mikrut did not object to the officers' entry of his home, and thus, the officers entered and found the weapons with his consent. But Mikrut argues, and the trial court found, that he objected to the police presence and refused consent.

"In reviewing a ruling on a motion to suppress, we accept the trial court's findings of fact as long as they are not against the manifest weight of the evidence, but we review de novo the court's ultimate ruling on the legality of the search or seizure." People v. Lewis, 363 Ill. App. 3d 516, 523 (2006).

Here, there was evidence that Mikrut objected to the officers entering his home and that they forced or pushed him into the home, where he was kept in the living room. Based on that evidence, the trial court factually found that Mikrut did not consent to a police entry of his home. That finding was not against the manifest weight of the evidence. Accordingly, we next address whether the seizure of the weapons was permissible under the fourth amendment.

### B. Randolph

In Randolph, the Supreme Court addressed whether an evidentiary seizure is lawful when a person who shares authority over a residence allows an entry and search, over another occupant's objection. Randolph's wife complained to the police that Randolph had taken their son away after

a domestic dispute. She also told officers that Randolph was a cocaine user. When the police arrived, Randolph stated that he had taken the son to a neighbor's house out of concern that his wife might take the child. The officers accompanied the wife to retrieve the child, and when they returned to the home, she told the officers where to find evidence of drug use in the home. Randolph refused permission to search, while his wife granted it. The officers entered, saw a drinking straw with a powdery residue on it, and contacted the district attorney, who told them to stop and apply for a warrant. Randolph's wife then withdrew her consent. The officers seized the straw and later obtained a warrant that allowed them to find further evidence.

Addressing a motion to suppress, the Court stated the issue as "whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." Randolph, 547 U.S. at ___, 164 L. Ed. 2d at 218, 126 S. Ct. at 1520. The Court first noted that the issue arose when a consenting occupant had common authority over the premises, but it clarified that it was sufficient that the person reasonably appeared to have common authority, even if he or she did not have a property interest in the premises. The Court then held that a physically present inhabitant's express refusal of consent to a police search is dispositive as to that person, regardless of the consent of a fellow occupant. Randolph, 547 U.S. at ___, 164 L. Ed. 2d at 226, 126 S. Ct. at 1526.

When reaching its determination, the Court discussed several considerations. First, it noted that a disputed invitation to police to enter gives an officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all. The Court recognized the interest of a cotenant in bringing criminal activity to light, but also noted ways in which that interest could be served without relying on a theory of consent that ignores an inhabitant's refusal to allow

a warrantless search. For example, the cotenant could act on his or her own initiative to deliver evidence to the police or assist the police in obtaining a warrant. In addition, exigent circumstances, such as hot pursuit or protection of the safety of police officers, might justify a warrantless search. See Randolph, 547 U.S. at ___, 164 L. Ed. 2d at 225, 126 S. Ct. at 1526 (citing multiple exigent circumstances). Thus, the Court noted that "[a] generalized interest in expedient law enforcement cannot, without more, justify a warrantless search." Randolph, 547 U.S. at ___ n.5, 164 L. Ed. 2d at 223 n.5, 126 S. Ct. at 1524 n.5.

The Court also rejected the claim that its holding would shield spousal abusers and other violent cotenants who refuse to allow police to enter when their victims ask the police for help. The Court clarified that its opinion had no bearing on the ability of the police to protect domestic violence victims, stating that the police could enter a home to help a person collect belongings and get out safely, and while lawfully on the premises, could seize items in plain view or take further action supported by probable cause. However, "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Randolph, 547 U.S. at ___, 164 L. Ed. 2d at 226, 126 S. Ct. at 1526.

The Court ended by noting that Randolph's refusal was clear. The Court also noted that the State did not argue that Randolph's wife gave any indication to the police of a need for protection that might have justified entry into the portion of the premises where the police found the straw. Finally, the State did not claim that the search should be upheld under the rubric of exigent circumstances. Randolph, 547 U.S. at ___, 164 L. Ed. 2d at 227, 126 S. Ct. at 1528. Thus, the evidence was improperly obtained under the fourth amendment.

C. The Present Case

In attempting to distinguish Randolph, the State relies on unpublished federal district court cases holding that Randolph applies only to a defendant who is present and objects to the search. See, e.g., United States v. Reed, No. 3:06--CR--75 (N.D. Ind. August 3, 2006); United States v. Crosbie, No. 06--047--CG (S.D. Ala. June 9, 2006). But here, Mikrut was present and did object to the police presence in his home. Thus, under Randolph, the entry was unreasonable as to him unless it was justified by something other than Phillips' consent.

The State argues that the officers were acting in a "community caretaking function" and seized items found in plain view. "Courts use the term 'community caretaking' to uphold searches or seizures under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute." People v. Luedemann, 222 Ill. 2d 530, 546 (2006). We do not deny that, in the exercise of their community caretaking function, the police were justified in doing what was necessary to prevent violence between Mikrut and Phillips. However, this did not give the police a general warrant to intrude wherever they wanted. Instead, the intrusion had to be strictly circumscribed by the exigencies justifying its initiation. Lewis, 363 Ill. App. 3d at 526; see generally People v. Rodgers, 96 Ill. App. 3d 416, 418 (1981) (investigation of violence call did not justify search beyond the living room). When officers have accomplished their caretaking purpose, they may not continue to expand the scope of an intrusion without additional justification. See generally People v. Bailey, 314 Ill. App. 3d 1059, 1063 (2000) (once officers met purpose of preventing defendant from interfering with an arrest of another by blocking him in a kitchen, further search of pockets and questioning him about his own criminality was not justified).

Here, the police were required to act reasonably--they could not act beyond the scope of their permissible reason for being in the home. Once Mikrut was secured in the living room, any further entry by the officers was unreasonable for fourth amendment analysis because any further intrusion was unnecessary. As the trial court observed, Phillips would have been able to retrieve her belongings without the police accompanying her to the bedroom. Thus, Welsch's presence there was unreasonable, and that fourth amendment violation invalidated the discovery of the rifle in the closet and the later discovery of the pistol. Accordingly, we determine that the evidence of the weapons found in the bedroom was properly suppressed.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and KAPALA, JJ., concur.